UNITED STATES v. SIOUX CITY STOCK YARDS CO.

(Circuit Court, N. D. Iowa, W. D.   July 13, 1908.)

No. 451.

**1. CARRIERS—TRANSPORTATION OF LIVE STOCK—RAILROAD COMPANIES.**

Where defendant stock yards company, as authorized by its articles of incorporation, constructed and maintained railroad tracks on acquired real estate and owned or leased and operated engines and cars for hire, by which it transported live stock brought to the Sioux City market by other interstate railroad companies between their terminals and the stock yards, and also hauled such of the products or freight of the packing houses from one to the other, as required, and cars loaded with fuel or ice to such houses from the different railroads entering the city, it was a railroad company or common carrier other than by water within the 28-hour law (Act June 29, 1906, c. 3594, 34 Stat. 607 [U. S. Comp. St. Supp. 1907, p. 918]), prohibiting any railroad or common carrier other than by water, whose road forms a part of a line of road over which animals shall be conveyed from one state to another, from confining the same for a longer period than 28 consecutive hours without unloading, etc.

**2. SAME—"COMMON CARRIERS."**

A "common carrier" of personal property is one who undertakes for hire to transport from place to place the goods of others who may choose to employ him for that purpose, including a terminal railroad company owning no cars of its own and transporting only the railroad cars of other companies.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 9, Carriers, §§ 1, 462–478.

For other definitions, see Words and Phrases, vol. 2, pp. 1313–1319; vol. 8, p. 7607.]

**3. SAME—STATUTES—CONSTRUCTION.**

The 28-hour law (Act June 29, 1906, c. 3594, 34 Stat. 607 [U. S. Comp. St. Supp. 1907, p. 918]) provides that no railroad or common carrier other than by water, whose road forms any part of a line over which cattle shall be conveyed from one state or territory into or through another state or territory, shall confine the same longer than 28 consecutive hours, except that on the written request of the owner the time of confinement may be extended to 36 hours, and section 3 declares that any carrier knowingly and willfully violating such provisions for every such failure shall be liable to a penalty of not less than $100 nor more than $500. *Held*, that but a single penalty is incurred for confining live stock beyond the period of 28 or 36 hours, so that the time of confinement beyond that period is not material, unless it be for another period of 28 or 36 hours.

**4. WORDS AND PHRASES—"WILLFULLY."**

The word "willfully" has various meanings, and is used to denote the quality of an act, or the intent with which it is done. It is frequently used in the sense of intentionally, willingly, designedly, or with set purpose. When used in criminal statutes, it usually means with a malevolent purpose or motive, with a wicked or criminal intent, especially if the forbidden act is one that is wrong in itself or involves moral turpitude; but if the forbidden act is not wrong in itself, or does not involve moral turpitude, the word is then used in the sense of intentionally or purposely, so that when the act is so done it is done willfully. The word, however, should be given that meaning only which the context indicates was intended. [Citing Words and Phrases, vol. 8, p. 7468 et seq.]

**5. CARRIERS — TRANSPORTATION OF LIVE STOCK — TWENTY-EIGHT HOUR LAW— CONSTRUCTION—"KNOWINGLY AND WILLFULLY."**

The 28-hour law (Act June 29, 1906, c. 3594, § 3, 34 Stat. 608 [U. S. Comp. St. Supp. 1907, p. 919]) declares that any railroad or common carrier other than by water, which "knowingly and willfully" fails to comply with the

provisions of the act, for every such failure shall be liable for and forfeit and pay a penalty of not less than $100 or more than $500. *Held,* that the statute is not criminal in the sense that a violation thereof constitutes a crime, and hence the words "knowingly and willfully" should not be construed to require the confinement of transported animals beyond the prescribed period with a malevolent purpose on the part of the carrier to cruelly torture them, but only to require that the animals be knowingly and intentionally confined beyond the prescribed period.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 5, p. 3939.]

**6.** SAME—EVIDENCE.

Defendant's railroad constituted a part of a line of railroad over which live stock was transported under an interstate shipment to defendant's stock yards. At the time the cattle were delivered to defendant by the connecting carrier, they had all been kept in the cars without being unloaded for rest, water, and feed for more than 36 hours, in violation of Act June 29, 1906, c. 3594, § 1, 34 Stat. 607 (U. S. Comp. St. Supp. 1907, p. 918), which fact was disclosed by the waybills, which were not delivered to defendant until after the cattle were in defendant's custody. The next and only place where the cattle could have been unloaded and watered was at defendant's yards at destination, where defendant delivered the cattle with all reasonable dispatch with the facilities it had for handling them. *Held,* that defendant had not "knowingly and willfully" failed to comply with the provisions of the 28-hour law (Act June 29, 1906, c. 3594, 34 Stat. 607), and was therefore not liable for a penalty for its violation.

## At Law.

Action to recover the penalty provided for a violation of the 28-hour law.

The defendant is an Iowa corporation, the general nature of its business as authorized by its articles of incorporation being, among other things, to acquire, own, and operate stock yards at Sioux City, in that state, to receive and care for live stock, and buy and sell the same on commission or otherwise, to acquire and hold real estate, and erect thereon any and all yards, fences, pens, or other structures necessary for such purposes, to construct and maintain railroad tracks, and to own, lease, or operate engines, cars, and steam, electric, or other railroads upon and across such property for just compensation. Its capital stock is $2,500,000, and its affairs are managed by a board of directors chosen from the stockholders. It has acquired grounds at Sioux City and erected thereon the necessary structures and buildings to enable it to receive, care for, ship, and otherwise handle live stock of all kinds, and the packing house products of the different packing houses located at Sioux City, and to receive from and deliver to the various railroads entering Sioux City, some six or seven in number, all engaged in interstate commerce, all such property brought to, and taken by them from, that city. For this purpose it has constructed and owns about seven miles of railroad tracks upon its grounds adjacent to its yards and buildings and the packing houses in Sioux City, and owns and operates three locomotive engines with its own crews for the transportation of cars from the tracks of the different railroad companies upon and over its own tracks to and from the consignees and shippers of such live stock and packing house products; and all of such property shipped into or out of Sioux City by railroad, and all live stock that is to be fed and watered by the different railroad companies entering Sioux City, is taken by the defendant from said railroad companies, and hauled by it with its own engines, over its own tracks, to its yards, and delivered to the consignee, or fed, watered, or otherwise cared for and returned to the proper railroad company. The greater part of its business of carrying is in transferring cars loaded with live stock from the different railroads to the consignees of such property at its yards, and from the shippers thereof and of the packing house products to the railroad companies, and it does this for all of such railroad companies and shippers at Sioux City. In fact, no such property can be shipped to or from Sioux City by railroad except from defendant's yards and over its tracks, which are connected by proper transfer

tracks with those of the different railroad companies. The cars may be delivered, however, to and from all such shippers within a distance of about 1½ miles from the terminal tracks of the different railroad companies. The defendant issues no shipping receipts or waybills, but receives from the railroad companies the waybills of the stock shipped to Sioux City, weighs the cars before and after they are unloaded to enable them to compute the amount of freight, and returns them to the railroads. It owns no cars other than its engines, and shippers wanting cars for outgoing shipments order them from the railroad over which they desire to ship. The defendant takes such cars from the railroad companies to the chutes of the shipper ordering them, loads the cars, hauls them over its tracks, and delivers them to the proper railroad company, which issues the usual railway receipts therefor to the shipper. For its services in so carrying or transferring cars and property, the defendant receives a stipulated sum from the railroad companies from whom it receives, and to whom it delivers, the cars handled by it. It also carries products of the different packing houses to and from each other in Sioux City, as they require, and coal and ice to them from the different railroads, and the packing houses pay it for such services.

March 30, 1907, the Chicago, Milwaukee & St. Paul Railway Company, one of the railroads entering Sioux City and engaged in interstate commerce, received at Mapleton, Minn., 72 head of cattle to be carried and delivered to Clay Robinson & Co., dealers in live stock at Sioux City. The cattle were loaded in two cars at 6 o'clock p. m. of that day, and were carried by that company to Sioux City, where they arrived at 5:40 o'clock a. m. of April 1st, and were delivered by it to the defendant at 6:35 a. m., and by the defendant to Clay Robinson & Co. at their chutes at defendant's stock yards about 9 a. m. of the same day. The shipper by proper writing requested that the cattle be confined without unloading for rest, food, and water for a period of 36 hours. They were not unloaded and fed or watered, either by the Chicago, Milwaukee & St. Paul Railway Company or the defendant after they were loaded at Mapleton, and before their delivery to Clay Robinson & Co. The government alleges that defendant is a railroad company, and a common carrier other than by water, whose road connects with that of the Chicago, Milwaukee & St. Paul Railway Company, and that it knowingly and willfully confined the cattle in the cars for a longer period than 36 hours without unloading them for food, water, and rest, as required by law, and asks judgment for the penalty provided therefor.

The defendant answers that it is not a railroad company, or a common carrier, and that it had nothing to do with the handling of the cattle until after the expiration of the 36-hour period, following the time they were loaded upon the cars at Mapleton.

F. F. Faville, U. S. Atty.
Milchrist & Scott, for defendant.

REED, District Judge (after stating the facts as above). Upon the foregoing facts two questions are presented for determination: (1) Is the defendant a railroad company, or common carrier other than by water, within the meaning of the act of Congress commonly known as the 28-hour law? (2) If it is, has it incurred the penalty provided for a violation of that law?

So far as necessary to be now considered, the act of Congress provides:

"Section 1. That no railroad, express company, car company common carrier other than by water, * * * whose road forms any part of a line of road over which cattle, sheep, swine or other animals shall be conveyed from one state or territory, * * * into or through another state or territory * * * shall confine the same in cars, boats, or vessels of any description for a period longer than twenty-eight consecutive hours without unloading the same in a humane manner, into properly equipped pens for rest, water, and

feeding, for a period of at least five consecutive hours, unless prevented by storm, or by other accidental or unavoidable causes which cannot be anticipated or avoided by the exercise of due diligence and foresight; provided, that upon the written request of the owner or person in custody of that particular shipment, which written request shall be separate and apart from any printed bill of lading, or other railroad form, the time of confinement may be extended to thirty-six hours. In estimating such confinement the time consumed in loading and unloading shall not be considered, but the time during which the animals have been confined without rest or food or water on connecting roads shall be included, it being the intent of this act to prohibit their continuous confinement beyond the period of twenty-eight hours, except upon the contingencies hereinbefore stated.  *  *  *

"Sec. 2.  *  *  *

"Sec. 3. That any railroad, express company, car company, common carrier, other than by water,  *  *  *  who knowingly and willfully fails to comply with the provisions of the preceding section shall for every such failure be liable for and forfeit and pay a penalty of not less than one hundred nor more than five hundred dollars.  *  *  *"  Act June 29, 1906, c. 3594, 34 Stat. 607, 608 (U. S. Comp. St. Supp. 1907, pp. 918, 919).

The defendant's articles of incorporation clearly provide that it may acquire real estate, construct and maintain railroad tracks thereon, and own or lease and operate engines and cars upon and over the same for just compensation. It has acquired real estate and constructed some seven miles of railroad tracks thereon, and owns three locomotive engines which it operates with its own employés upon such tracks in hauling cars of all railroad companies entering Sioux City loaded with live stock destined for the market at that place, and all cars loaded at that place with live stock or packing house products consigned to other markets. It also carries or hauls over its tracks, by means of its locomotives, such of the products or freight of the packing houses from one to the other at Sioux City as they may require, and cars loaded with fuel or ice to such houses from the different railroads entering Sioux City. That it is not the business of an ordinary stock yards company to do this, and that it acts as a railroad company in so doing, cannot be doubted. It may be that its principal business is that of conducting a stock yards and dealing in live stock, but that is no reason why it may not operate a railroad. As incident to the successful operating of its stock yards, the transfer in car load lots of its own live stock and that of other shippers and dealers in such property and the products thereof at its yards, to and from the different railroads entering Sioux City, is absolutely necessary, and to effect such transfer it acts as a railroad company and operates a railroad under its articles of incorporation. The fact that it operates its road only within a distance of 1½ miles, the distance from the terminal tracks of the other railroads at Sioux City, to its yards, and the different chutes or places of loading and unloading cars, is wholly immaterial. Its character as a railroad company is established when it does the business of a railroad, and in a manner in which a railroad is usually operated, and not from the length of its road or tracks. It is therefore a railroad company and acts as such in the transfer of the cars of the other railroad companies to and from its stock yards, and to each other when required, and its road forms a part of the line of the several railroads over which live stock of all kinds is shipped from points outside the state of Iowa and delivered to dealers in such

property at Sioux City, and by them to the other roads to be carried to markets outside the state of Iowa. That its roadbed and tracks constitute a railroad apart from its locomotives or other equipment, see Lake Shore, etc., R. R. Co. v. United States, 93 U. S. 442–454, 23 L. Ed. 965.

Defendant is also a "common carrier" of personal property, which is defined to be:

"One who undertakes for hire to transport from place to place the goods of others who may choose to employ him for that purpose." The Niagara v. Cordes, 21 How. (U. S.) 7–22, 16 L. Ed. 41; Liverpool Steam Co. v. Phenix Ins. Co., 129 U. S. 397–437, 9 Sup. Ct. 469, 32 L. Ed. 788; Cownie Glove Co. v. Merchants' Dispatch Co., 130 Iowa, 327, 106 N. W. 749; Jackson Iron Works v. Hurlbut, 158 N. Y. 34–38, 52 N. E. 665, 70 Am. St. Rep. 432; Gordon v. Hutchinson, 1 Watts & S. (Pa.) 285, 37 Am. Dec. 464; Kimball v. Rutland, etc., R. R. Co., 26 Vt. 247, 62 Am. Dec. 567; Dwight v. Brewster, 1 Pick. (Mass.) 50, 11 Am. Dec. 133; Story on Bailments, §§ 495, 496; Moore on Carriers, p. 18 et seq.

One may be a common carrier of railroad cars only, as well as of other personal property. Peoria R. R. Co. v. Chicago, etc., R. R. Co., 109 Ill. 138, 50 Am. Rep. 605; Moore on Carriers, p. 45, § 14, and note.

But though defendant was not a public or common carrier within the technical meaning of that term, and carried over its tracks only the cars brought by the Chicago, Milwaukee & St. Paul Ry. Co. to Sioux City, its road would still form a part of a line of railroad over which live stock was brought from outside the state of Iowa to the market at Sioux City, and is literally within the terms of the act of Congress in question. To bring its road within the meaning of that act, it is not necessary that it be operated under an arrangement for its common control or management with that of the Chicago, Milwaukee & St. Paul Railway Company, or with those of any of the other roads entering Sioux City. It is enough that its road forms a part of a line over which live stock is brought from points without the state of Iowa to the markets in that state. See United States v. Colorado & N. W. R. R. Co. (C. C. A.) 157 Fed. 321, 323, 325.

Has the defendant incurred the penalty provided by law for confining these cattle longer than 36 hours? It is urged with apparent confidence by counsel for the government that it has. In addition to the ultimate facts before stated, the testimony shows that the train which brought these cattle to Sioux City was due to arrive at that place at 3:45 a. m. of April 1st, that it did not arrive until 5:40 a. m., and the cars containing the cattle were not delivered to the defendant until 6:35 a. m., or 35 minutes after the expiration of the 36-hour period immediately following the time the cattle were loaded at Mapleton. The waybills delivered to defendant showed that the cattle were shipped from Mapleton at 6 o'clock p. m. on March 30th, and attached to these was the written request of the owner of the cattle for their confinement for a period of 36 hours. Including these two cars, there were delivered to the defendant by the various railroad companies between 6 and 6:35 a. m. of April 1st, 83 cars of live stock, all of which were delivered at the chutes of the different consignees as soon as the

facilities for handling that number of cars would permit, and before 9 o'clock a. m. This was not an unusual number of cars to be delivered in one morning, and defendant had facilities to handle, and frequently handled, 150 or more cars in one morning; but in such instances the cars would be delivered to it at different times within a period of two or three hours, and it was an unusual occurrence to have 83 cars delivered within 35 minutes. Two cars, a half dozen, or perhaps more, could have been delivered at the chutes of Clay Robinson & Co. within 20 or 30 minutes after they were received by the defendant, and the contention of the government is that the delivery of the 83 cars to the defendant within 35 minutes, though unusual, is no excuse for not delivering the cars in question to the consignees within a very short time after the defendant received them, and that by its failure to deliver them until 9 o'clock it has incurred the penalty provided by the act. Conceding that the two cars might have been sooner delivered, then others of the cars would necessarily have been delayed, and, according to the contention of the government, the penalty might have been incurred by delaying them. A sufficient answer, however, to this contention is: (1) That the cattle had been confined more than 36 consecutive hours from the time they were loaded upon the cars when they were delivered to the defendant; and (2) that the evidence fails to show that defendant "knowingly and willfully" confined them, or participated in so doing, for the period, or any part thereof, of 36 hours immediately following their loading at Mapleton. The preceding carrier therefore had fully incurred the penalty provided by law for so confining them before it delivered the cattle to defendant. It is true that the statute provides that, in computing the time that the cattle were confined without unloading, the time during which they have been so confined on connecting roads shall be included. But a single penalty is incurred for confining live stock beyond the period of 28 or 36 hours, and the time of its confinement beyond that period is not material, unless it should be for another period of 28 or 36 hours, when it might be claimed that another penalty had been incurred—a question, however, not now determined. If defendant had received the cattle before the expiration of the period during which it was permissible to confine them, though but a short time, knowing that they had not been unloaded for the required rest, food, and water, and had then willfully confined them beyond the period, there might be reason for urging that, as it was not required to receive them when there was not sufficient time and opportunity to unload them within the required period, and it had not in fact unloaded them, it had incurred the penalty. But that question is not presented by this record, and it need not be considered, or determined, until it is. In this case the cattle were placed upon the transfer track for defendant about the same time or shortly before the waybills were delivered to it, and not until it received the waybills did it know, so far as the testimony shows, when the cattle were loaded, or from what place they were shipped. This was the first and only information defendant had of the time the cattle were loaded or shipped. There is no presumption that the cattle had not been unloaded, fed, and

watered within the required time by the preceding carrier. The presumption, rather, is that that carrier had performed its duty under the law. True, it is stipulated that the cattle had not been unloaded for food, water, and rest before they were delivered to defendant; but it is not stipulated, and there is no proof, that defendant so knew when it received the cattle. It would incur the penalty only when it "knowingly and willfully" confined them, or participated in confining them, longer than the prescribed period. The meaning of these words, as used in the statute, has been discussed. The word "willfully" has various meanings, and is used to denote the quality of an act, or the intent with which it is done. It is frequently used in the sense of intentionally, willingly, designedly, or with set purpose. Century Dictionary. When used in criminal statutes, it usually means with a malevolent purpose or motive, with wicked or criminal intent, especially if the forbidden act is one that is wrong in itself, or involves moral turpitude. Spurr v. United States, 174 U. S. 728–734, 19 Sup. Ct. 812, 43 L. Ed. 1150. If the forbidden act is not wrong in itself, or does not involve moral turpitude, the word is then often used in the sense of intentionally, or purposely, and when the act is so done it is done willfully within the meaning of the statute. Armour Packing Co. v. United States, 28 Sup. Ct. 428–437, 52 L. Ed. ——, affirming 153 Fed. 1–23, 82 C. C. A. 135. The word should be given that meaning only which the context indicates should be given to it. Words and Phrases, p. 7468 et seq.

The statute in question is not a criminal one in the sense that a violation of it constitutes a crime. A penalty is imposed for the violation, which is to be recovered by civil action in the proper Circuit or District Court of the United States. The primary purpose of the statute, as indicated by its title, is to prevent cruelty to animals while being transported by railroad or other means of conveyance. It may also have been to prevent damages to the owner by reason of such confinement. But, in either event, the penalty, or liability for damages, if any, is incurred only when the stock is confined, "knowingly and willfully," beyond the prescribed time, and when so confined the penalty at least is incurred. It does not seem that it was intended to require proof that the animals were confined beyond the prescribed period with a malevolent purpose upon the part of the carrier of cruelly torturing them, or of doing damage to their owner, before the penalty is incurred. To require such proof would largely thwart the purpose of the statute, for seldom, if ever, could it be adduced. The more reasonable interpretation is that, if the stock is knowingly and intentionally confined beyond the 28 or 36 hour period, the carrier, receiving it within and confining it beyond that period incurs the penalty provided by the statute. If a railroad company should load stock at one of its stations, when, by the schedule or ordinary running time of its train upon which it is loaded, it cannot reach a place where they may be unloaded and given the required rest, food, and water within the prescribed time, and they are not in fact given such rest and food, it may well be held to have knowingly and willfully—that is, intentionally or purposely—violated the statute, though it had no purpose or mo-

tive of torturing the animals or doing damage to the owner. When defendant received the waybills of the cars in question, it, no doubt, could have learned, by inquiry, that the cattle had not been fed and watered since they were loaded at Mapleton; but the cattle were then in its custody and, if it had so learned, it would not have relieved them to have turned them back to the preceding carrier. In fact, the testimony shows that the next place, and the only place in Sioux City, where they could have been unloaded and watered, was at defendant's yards, and that defendant delivered them at those yards with all reasonable dispatch with the facilities it had for handling them. It cannot therefore reasonably be held that the defendant acted willfully in confining the cattle after it received them, or that it participated in confining them any part of the time for which the penalty sought to be recovered was incurred.

The conclusion therefore is that, while the defendant is a railroad company and a common carrier other than by water, whose road forms a part of a line of railroad over which live stock is carried from points without the state of Iowa and delivered to the markets at Sioux City, within that state, the testimony fails to show that it has incurred the penalty for confining these cattle contrary to the provision of the act of Congress.

The petition should therefore be dismissed, and it is accordingly so ordered.