# UNITED STATES v. CALIFORNIA.

No. 33.   Argued January 16, 17, 1936.—Decided February 3, 1936.

*Assistant Solicitor General Bell,* with whom *Solicitor General Reed, Assistant Attorney General Keenan,* and Messrs. *David V. Cahill, M. S. Huberman, Charles E. Wyzanski, Jr.,* and *Daniel W. Knowlton* were on the brief, for the United States.

*Mr. Ralph O. Marron,* Deputy Attorney General of California, with whom *Mr. U. S. Webb,* Attorney General, was on the brief, for the State of California.

MR. JUSTICE STONE delivered the opinion of the Court.

This is a suit brought by the United States against the State of California in the District Court for northern California to recover the statutory penalty of $100 for violation of the federal Safety Appliance Act, § 2, Act of March 2, 1893, c. 196, 27. Stat. 531, 45 U. S. C. § 2, and § 6 of the Act as amended April 1, 1896, 29 Stat. 85, 45 U. S. C., § 6.[1]

The complaint alleges that California, in the operation of the state-owned State Belt Railroad, is a common carrier engaged in interstate transportation by railroad, and that it has violated the Safety Appliance Act by hauling over the road a car equipped with defective coupling apparatus. Upon the trial, without a jury, upon stipulated facts, the district court gave judgment for the United States. The Court of Appeals for the Ninth Circuit reversed, 75 F. (2d) 41, on the ground that as exclusive jurisdiction of suits to which a state is a party is conferred upon this Court by § 233 of the Judicial Code, 36 Stat. 1156, 28 U. S. C. 341, the district court was without

[1] "Section 2. It shall be unlawful for any common carrier engaged in interstate commerce by railroad to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars."

"Section 6. Any common carrier engaged in interstate commerce by railroad using any locomotive engine, running any train, or hauling or permitting to be hauled or used on its line any car in violation of any of the preceding provisions of this chapter, shall be liable to a penalty of $100 for each and every such violation, to be recovered in a suit or suits to be brought by the United States district attorney in the district court of the United States having jurisdiction in the locality where such violation shall have been committed; and it shall be the duty of such district attorney to bring such suits upon duly verified information being lodged with him of such violation having occurred: . . ."

jurisdiction of the cause. We granted certiorari to review the case as one involving questions of public importance, upon a petition of the government which urged that the state is a common carrier by railroad, subject to the Safety Appliance Act, and, under its provisions, to suit in the district court to recover penalties for violation of the Act.

In an earlier suit, *Sherman* v. *United States,* 282 U. S. 25, brought against the Board of State Harbor Commissioners, which supervises operation of the State Belt Railroad, to recover penalties for violation of the Act, this Court set aside the judgment of the district court for the government because the state had not been made a party.

■ Whether a transportation agency is a common carrier depends not upon its corporate character or declared purposes, but upon what it does. *United States* v. *Brooklyn Terminal,* 249 U. S. 296, 304. The State Belt Railroad is owned and operated by the state, see *Sherman* v. *United States, supra.* It parallels the water front of San Francisco harbor and extends onto some forty-five state-owned wharves. It serves directly about one hundred and seventy-five industrial plants, has track connection with one interstate railroad, and, by wharf connections with freight car ferries, links that and three other interstate rail carriers with freight yards in San Francisco leased to them by the state. It receives and transports from the one to the other, by its own engines, all freight cars, loaded and empty, and the freight they contain, offered to it by railroads, steamship companies and industrial plants. The larger part of this traffic has its origin or destination in states other than California. For the transportation service it makes a flat charge per car. It issues no bills of lading and is not a party to through rates. It moves the cars on instructions contained in "switch lists" made out by the delivering or receiving carrier, which pays the charge and absorbs it in its rate. The

charge on cars not delivered to or received from another carrier is paid by the industry concerned.

The Belt Railroad is thus a terminal railroad for the industries and carriers with which it connects, and it serves as a link in the through transportation of interstate freight shipped to or from points in San Francisco over the connecting carriers. Its service is of a public character, for hire, and does not differ in any salient feature from that which this Court, in *United States* v. *Brooklyn Terminal, supra,* 304, 305, held to be common carriage by rail in interstate commerce within the meaning of the federal Hours of Service Act, 34 Stat. 1415, 45 U. S. C., § 61.

The state insists that the facts that it maintains no freight station, issues no bills of lading, and is engaged only in moving cars for a flat rate instead of at a charge per hundred pounds of freight moved, distinguish the operation of its railroad from that of the Brooklyn Terminal. As the service involves transportation of the cars and their contents, the method of fixing the charge is unimportant. *Belt Railway of Chicago* v. *United States,* 168 Fed. 542, 544; see *United States* v. *Union Stock Yard & Transit Co.,* 226 U. S. 286, 299, 300. And while maintenance of a freight station and the issue of bills of lading may be embraced in the service of a common carrier, and a part of interstate commerce, see *United States* v. *Ferger,* 250 U. S. 199; *Atchison, T. & S. F. Ry. Co.* v. *United States,* 295 U. S. 193, they are not indispensable adjuncts to either where the subject of transportation, here cars loaded and empty, may be effected without.

All the essential elements of interstate rail transportation are present in the service rendered by the State Belt Railroad. They are the receipt and transportation, for the public, for hire, of cars moving in interstate commerce. See *United States* v. *Union Stock Yard & Transit Co., supra,* 299; *Union Stockyards Co.* v. *United*

*States,* 169 Fed. 404; *Belt Railway of Chicago* v. *United States, supra.* Its service, involving as it does the transportation of all carload freight moving in interstate commerce between the industries concerned and all railroad and steamship lines reaching the port, is of the same character, though wider in scope, as that held to be common carriage by rail in interstate commerce in the *Brooklyn Terminal* and the *Union Stockyard* cases. They abundantly support the conclusion that such is the service rendered by the state in the present case, a conclusion twice reached by the Court of Appeals for the Ninth Circuit, see *McCallum* v. *United States,* 298 Fed. 373; *Tilden* v. *United States,* 21 F. (2d) 967.

■ The state urges that it is not subject to the federal Safety Appliance Act. It is not denied that the omission charged would be a violation if by a privately-owned rail carrier in interstate commerce. But it is said that as the state is operating the railroad without profit, for the purpose of facilitating the commerce of the port, and is using the net proceeds of operation for harbor improvement, see *Sherman* v. *United States, supra, Denning* v. *State,* 123 Cal. 316, it is engaged in performing a public function in its sovereign capacity and for that reason cannot constitutionally be subjected to the provisions of the federal Act. In any case it is argued that the statute is not to be construed as applying to the state acting in that capacity.

Despite reliance upon the point both by the government and the state, we think it unimportant to say whether the state conducts its railroad in its "sovereign" or in its "private" capacity. That in operating its railroad it is acting within a power reserved to the states cannot be doubted. See *Puget Sound Power & Light Co.* v. *Seattle,* 291 U. S. 619, 624; *Green* v. *Frazier,* 253 U. S. 233; *Jones* v. *Portland,* 245 U. S. 217. The only question we need consider is whether the exercise of that power, in

whatever capacity, must be in subordination to the power to regulate interstate commerce, which has been granted specifically to the national government. The sovereign power of the states is necessarily diminished to the extent of the grants of power to the federal government in the Constitution. The power of a state to fix intrastate railroad rates must yield to the power of the national government when their regulation is appropriate to the regulation of interstate commerce. *United States v. Louisiana,* 290 U. S. 70, 74, 75; *Wisconsin Railroad Comm'n* v. *Chicago, B. & Q. R. Co.,* 257 U. S. 563; *Shreveport Rate Cases,* 234 U. S. 342. A contract between a state and a rail carrier fixing intrastate rates is subject to regulation and control by Congress, acting within the commerce clause, *New York* v. *United States,* 257 U. S. 591, as are state agencies created to effect a public purpose, see *Sanitary District of Chicago* v. *United States,* 266 U. S. 405; *Board of Trustees* v. *United States,* 289 U. S. 48; see *Georgia* v. *Chattanooga,* 264 U. S. 472. In each case the power of the state is subordinate to the constitutional exercise of the granted federal power.

The analogy of the constitutional immunity of state instrumentalities from federal taxation, on which respondent relies, is not illuminating. That immunity is implied from the nature of our federal system and the relationship within it of state and national governments, and is equally a restriction on taxation by either of the instrumentalities of the other. Its nature requires that it be so construed as to allow to each government reasonable scope for its taxing power, see *Metcalf & Eddy* v. *Mitchell,* 269 U. S. 514, 522–524, which would be unduly curtailed if either by extending its activities could withdraw from the taxing power of the other subjects of taxation traditionally within it. *Helvering* v. *Powers,* 293 U. S. 214, 225; *Ohio* v. *Helvering,* 292 U. S. 360; *South Carolina* v. *United States,* 199 U. S. 437; see *Murray* v. *Wilson*

*Distilling Co.*, 213 U. S. 151, 173, explaining *South Carolina* v. *United States, supra.* Hence we look to the activities in which the states have traditionally engaged as marking the boundary of the restriction upon the federal taxing power. But there is no such limitation upon the plenary power to regulate commerce. The state can no more deny the power if its exercise has been authorized by Congress than can an individual.

California, by engaging in interstate commerce by rail, has subjected itself to the commerce power, and is liable for a violation of the Safety Appliance Act, as are other carriers, unless the statute is to be deemed inapplicable to state-owned railroads because it does not specifically mention them. The federal Safety Appliance Act is remedial, to protect employees and the public from injury because of defective railway appliances, *Swinson* v. *Chicago, St. Paul, M. & O. Ry. Co.*, 294 U. S. 529; *Fairport, P. & E. R. Co.*, v. *Meredith*, 292 U. S. 589, 594; *Johnson* v. *Southern Pacific Co.*, 196 U. S. 1, 17, and to safeguard interstate commerce itself from obstruction and injury due to defective appliances upon locomotives and cars used on the highways of interstate commerce, even though their individual use is wholly intrastate. *Southern Ry. Co.* v. *United States*, 222 U. S. 20; *Moore* v. *Chesapeake & Ohio Ry. Co.*, 291 U. S. 205, 214. The danger to be apprehended is as great and commerce may be equally impeded whether the defective appliance is used on a railroad which is state-owned or privately-owned. No convincing reason is advanced why interstate commerce and persons and property concerned in it should not receive the protection of the act whenever a state, as well as a privately-owned carrier, brings itself within the sweep of the statute, or why its all-embracing language should not be deemed to afford that protection.

In *Ohio* v. *Helvering, supra,* it was held that a state, upon engaging in the business, became subject to a federal

statute imposing a tax on those dealing in intoxicating liquors, although states were not specifically mentioned in the statute. The same conclusion was reached in *South Carolina* v. *United States, supra;* and see *Helvering* v. *Powers, supra.* Similarly the Interstate Commerce Commission has regarded this and other state-owned interstate rail carriers as subject to its jurisdiction, although the Interstate Commerce Act does not in terms apply to state-owned rail carriers. See *California Canneries Co.* v. *Southern Pacific Co.,* 51 I. C. C. 500, 502, 503; *United States* v. *Belt Line R. Co.,* 56 I. C. C. 121; *Texas State Railroad,* 34 I. C. C. Val. R. 276.

Respondent invokes the canon of construction that a sovereign is presumptively not intended to be bound by its own statute unless named in it, see *Guarantee Title & Trust Co.* v. *Title Guaranty Co.,* 224 U. S. 152; *United States* v. *Herron,* 20 Wall. 251; *In re Fowble,* 213 Fed. 676. This rule has its historical basis in the English doctrine that the Crown is unaffected by acts of Parliament not specifically directed against it. *United States* v. *Herron, supra,* 255; *Dollar Savings Bank* v. *United States,* 19 Wall. 227, 239. The presumption is an aid to consistent construction of statutes of the enacting sovereign when their purpose is in doubt, but it does not require that the aim of a statute fairly to be inferred be disregarded because not explicitly stated. See *Baltimore National Bank* v. *State Tax Commission of Maryland,* decided this day, *post,* p. 209. We can perceive no reason for extending it so as to exempt a business carried on by a state from the otherwise applicable provisions of an act of Congress, all-embracing in scope and national in its purpose, which is as capable of being obstructed by state as by individual action. Language and objectives so plain are not to be thwarted by resort to a rule of construction whose purpose is but to resolve doubts, and whose application in the circumstances would be highly

artificial. It was disregarded in *Ohio* v. *Helvering, supra,* and *South Carolina* v. *United States, supra.* See *Heiner* v. *Colonial Trust Co.,* 275 U. S. 232, 234, 235.

■ The jurisdiction of the district court to entertain suits by the United States against a state under the Safety Appliance Act turns on the construction to be given to § 6 of the Act in the light of § 233 of the Judicial Code. Article III, § 2 of the Constitution extends the judicial power of the United States and the original jurisdiction of the Supreme Court to cases "in which a state shall be a party." See *United States* v. *West Virginia,* 295 U. S. 463, 470, and cases cited. But Congress may confer on inferior courts concurrent original jurisdiction of such suits. *Ames* v. *Kansas,* 111 U. S. 449; *United States* v. *Louisiana,* 123 U. S. 32; compare *Börs* v. *Preston,* 111 U. S. 252. Section 233 of the Judicial Code, 28 U. S. C., 341, originally enacted as § 13 of the Judiciary Act of 1789, 1 Stat. 80, became § 687 of the Revised Statutes, and was carried into the Judicial Code in 1911, 36 Stat. 1156. It gives to this Court "exclusive jurisdiction of all controversies of a civil nature where a state is a party, except between a state and its citizens or between a state and citizens of other states or aliens." The later enacted § 6 of the Safety Appliance Act, see *Smiley* v. *Holm,* 285 U. S. 355, provides that the penalty which it imposes is "to be recovered in a suit or suits to be brought . . . in the district court of the United States having jurisdiction in the locality where such violation shall have been committed. . . ."

If it be assumed that the present suit to recover the payment denominated a "penalty" by § 6 is a controversy of a civil nature, but see *Wisconsin* v. *Pelican Insurance Co.,* 127 U. S. 265; cf. *Milwaukee County* v. *M. E. White Co.,* 296 U. S. 268, it is by § 233 of the Judicial Code within the exclusive jurisdiction of this Court, unless that provision is supplanted with respect

to suits such as the present by the provisions of § 6. Upon that assumption § 6 is in conflict with § 233 of the Judicial Code and supersedes it, *United States* v. *Yuginovich,* 256 U. S. 450, 463; *United States ex rel. Chandler* v. *Dodge County Comm'rs,* 110 U. S. 156; *United States* v. *Tynen,* 11 Wall. 88, 92, unless, again, the general language of § 6 is to be taken as not applying to suits brought against a state. Since the section which, as we have held, imposes the liability upon state- and privately-owned carriers alike, also provides the remedy and designates the manner and the court in which the remedy is to be pursued, we think the jurisdictional provisions are as applicable to suits brought to enforce the liability of states as to those against privately-owned carriers, and that the district court had jurisdiction.

If we lay aside possible doubts, whether the suit is of a "civil nature," in which case only does § 233 of the Judicial Code purport to make the jurisdiction of this Court exclusive, still, in construing the jurisdictional provisions of § 6 of the Safety Appliance Act practical convenience and "the tacit assumptions" upon which it is reasonable to suppose its language was used, see *Ohio ex rel. Popovici* v. *Agler,* 280 U. S. 379, 383, are not to be disregarded. The controversy in a suit authorized by § 6 is essentially local in character and involves issues for which a jury trial may be appropriate, compare *Georgia* v. *Brailsford,* 3 Dall. 1. Their adjudication often requires the presence, as witnesses, of railroad workers, shippers and others of the locality. These are considerations which undoubtedly led to the command that the suit should be brought in the district court of the "locality" where violations occur. They are considerations as applicable to suits against a state as to suits against a privately-owned railroad. The suggestion that it should be assumed that Congress did not intend to subject a sovereign state to the inconvenience and loss of dignity in-

volved in a trial in a district court is not persuasive when weighed against the complete appropriateness of the court and venue selected for the trial of issues growing out of the particular activity in which the state has chosen to engage.

*Reversed.*