## STATE OF CALIFORNIA v. ANGLIM, Collector of Internal Revenue.

### No. 21433-W.

District Court, N. D. California, S. D.

March 6, 1941.

Earl Warren, Atty. Gen., of California, and L. E. Kilkenny, Deputy Atty. Gen., for plaintiff.

Frank J. Hennessy, U. S. Atty., and Esther B. Phillips, Asst. U. S. Atty., both of San Francisco, Cal., for defendant.

WELSH, District Judge.

The plaintiff, State of California, seeks to recover taxes collected by the defendant, as United States Collector of Internal Revenue for the First District of California, by virtue of the provisions of the Carrier's Taxing Act of 1937, c. 405, 50 Stat. 435, 45 U.S.C.A. §§ 261–273. The taxes sought to be recovered herein were collected from the State of California by reason of its ownership and operation of the State Belt Railroad, a terminal line adjoining the Port of San Francisco and operated under the management of the State Board of Harbor Commissioners for the Port of San Francisco.

The United States Supreme Court has determined the status of the State Belt Railroad to be that of an interstate common carrier railroad. United States v. State of California, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567.

And under the terms of the Carrier's Taxing Act of 1937, interstate carriers by rail are subject to the payment of a federal excise tax based on specified percentages of the compensation paid to their employees. On a similar basis, the Act also imposes an income tax on such employees, which must be deducted from their compensation and remitted by the employer to the Collector of Internal Revenue.

It is the position of the State of California that the State Belt Railroad, although having the status of an interstate common carrier railroad, is performing an essentially governmental function; that, consequently, it is immune from the imposition of any federal excise tax under the Carrier's Taxing Act of 1937 by reason of the settled doctrine of implied immunity of

state and federal government from the burden of taxation by either upon the government instrumentalities of the other. If this be true, admittedly the taxes were illegally assessed and plaintiff would be entitled to a return of the excise tax paid by it. Plaintiff would also be entitled to a return of the income tax paid by it on behalf of the Belt Railroad employees to the extent that the plaintiff has complied with all conditions precedent to recovery of the Employees' tax. On the other hand, if it be determined that the State of California is acting in a purely proprietary capacity in its operation of the railroad, defendant is entitled to judgment herein.

The State Belt Railroad, commonly known and hereinafter referred to as the Belt, is about five miles in length. Its tracks run along the waterfront of San Francisco. It is situated mostly on state owned land. Its properties consist of roadbeds, tracks, equipment, spurs, switches, roundhouses and yards. Its main line connects with the piers, wharves and freight car ferries along the city's waterfront, and with freight yards of the Belt and privately owned rail carriers. It also connects with about one hundred seventy-five industrial plants located at various points along the line. The function of the line is the transportation over its tracks by its own engines of loaded and empty freight cars between the points with which it connects, for various rail carriers, steamship companies and industries, for which it charges a flat rate per car. The Belt Railroad serves as a link in the through transportation of interstate freight shipped to or from points in San Francisco over connecting carriers. The Board of State Harbor Commissioners fixes the charges to be imposed for the services performed by the Belt Line. These charges are based upon the amount necessary to enable the Board to perform the duties required of it by law. Receipts obtained from the operation of the Belt Line are credited to the San Francisco Harbor Improvement Fund. With one exception, the Belt has a separate set of employees, numbering about one hundred thirty eight, who render no services other than in connection with the operation of the Belt Line. These employees are under civil service.

While most of the Belt is under the direct administration and supervision of the Board of Harbor Commissioners, a portion of its trackage is operated by privately owned rail carriers as agents of the State.

The Port of San Francisco, with which the Belt connects, and the harbor facilities there afforded, consisting of wharves, piers, landings and other improvements, is state owned, and operated under the management and control of the Board of State Harbor Commissioners. In its operation and maintenance of the Port, the Board performs many functions governmental in nature. It maintains harbor police, fireboats, thoroughfares, public dry docks, and aids to navigation; it cares for the removal of obstructions to commerce and navigation.

The establishment by government of ports and harbors, wherever conditions exist which render harbor development advantageous, is designed to afford a medium for the attraction and flow of commerce into and through the seaport area for the benefit and prosperity of the numerous persons necessarily affected by the resulting stimulation of industrial and trade activity in such area. In its scope and effect, port and harbor development, designed to facilitate the flow of commerce, cannot properly be classified as commerce itself, normally conducted by private industry. The importance to the general welfare, the public at large, of adequate ports and harbors for the stimulation of navigation and commerce; the fact that the development of ports and harbors has not occurred at the hands of private industry, but has remained in the reigns of government as a recognized sovereign right and duty, these considerations, in the opinion of this court, have rightfully marked the operation of ports and harbors a proper function of government. Denning v. State of California, 123 Cal. 316, 55 P. 1000; Commissioner of Internal Revenue v. Ten Eyck, 2 Cir., 76 F.2d 515.

Plaintiff now seeks the judicial inclusion of the Belt Line as one of the Port of San Francisco terminal facilities operated by the State of California in its exercise of a purely governmental function. Whether the State of California acts in a sovereign or private capacity in its operation of the Belt is, at this time, an open question. However, while we have no direct precedent to guide us on the subject, the trend of judicial opinion in regard thereto, seems to this court to have been sufficiently manifested in the decisions which have so far been recorded.

In State of South Carolina v. United States, 199 U.S. 437, 26 S.Ct. 110, 114, 50 L.Ed. 261, 4 Ann.Cas. 737, it was held that South Carolina, by taking over the sale of intoxicating liquor within its borders, became liable for the payment of a federal excise· tax imposed on the sale of liquor, notwithstanding the fact that the action taken by the state was in the exercise of its police power. The Court conceded that the argment that the imposition by the federal government of a tax upon a business operated by the state in the interests of public welfare, interfered with the state's exercise of its police power, presented a serious question; but held, however, that were such argument to succeed, the state governments, under principles of regulation, could extend their operations over various business enterprises to the serious impairment, if not complete destruction, of the power of the Federal Government to exercise its constitutionally granted taxing powers. The Court stated: "There is something of a ̀conflict between the full power of the nation in respect to taxation and the exemption of the state from Federal taxation in respect to its property and a discharge of all its functions. Where and how shall the line between them be drawn? "

The Court then concluded that the only consistent course to follow is to limit the exemption of state agencies and instrumentalities from national taxation to those which are of a strictly governmental character, and not to extend such immunity to those state activities which are of a private nature, normally carried on in private ownership.

In United States v. State of California, 297 U.S. 175, 56 S.Ct. 421, 424, 80 L.Ed. 567, the Supreme Court reiterated this principle in discussing the immunity of state instrumentalities from federal taxation, in the following language: "That immunity is implied from the nature of our federal system and the relationship within it of state and national governments, and is equally a restriction on taxation by either of the instrumentalities of the other. Its nature requires that it be so construed as to allow to each government reasonable scope for its taxing power * * * which would be unduly curtailed if either by extending its activities could withdraw from the taxing power of the other subjects of taxation traditionally within it. * * * Hence we look to the activities in which the states have traditionally engaged as marking the boundary of the restriction upon the federal taxing power. * * * "

In Helvering v. Gerhardt, 304 U.S. 405, 58 S.Ct. 969, 973, 82 L.Ed. 1427, the United States Supreme Court advances further reasons why the courts should narrowly limit the doctrine of implied immunity, when claimed by state governments against federal taxation, to such state activities considered essential to the preservation of state governments. The Court said: "There are cogent reasons why any constitutional restriction upon the taxing power granted to Congress, so far as it can be properly raised by implication, should be narrowly limited. One * * * is that the people of all the states have created the national government and are represented in Congress. Through that representation they exercise the national taxing power. The very fact that when they are exercising it they are taxing themselves serves to guard against its abuse through the possibility of resort to the usual processes of political action which provides a readier and more adaptable means than any which courts can afford, for securing accommodation of the competing demands for national revenue, on the one hand, and for reasonable scope for the independence of state action, on the other."

We look, then, to the nature of the activity in which the state is engaged; and, before immunity from federal taxation is extended to such activity, it must appear that such activity is essentially and traditionally governmental in nature. It does not appear to this court that the operation by a state of a terminal railroad line for the transportation of carload freight for the public for hire, between a state owned and operated port and connecting carriers and industries is, in its nature, an essentially governmental function. Nor is there any evidence that, in the United States, terminal railroad lines connecting with government owned ports and serving the public for compensation have been traditionally in the hands of government. The only evidence adduced at the trial bearing on this matter was that in Albany, New York, a terminal railroad line is operated by harbor commissioners under a setup similar to the State Belt Railroad at San Francisco; and that a terminal railroad line connecting with the Port of Los Angeles, California, and serving the

public in a manner similar to the Belt line, is in private ownership.

In the case of People of the State of New York ex rel. Rogers v. Graves et al., 299 U.S. 401, 57 S.Ct. 269, 272, 81 L.Ed. 306, the United States Supreme Court held that the Panama Canal Railroad line, connecting with the Canal, was a governmental instrumentality. It is significant to note that the court's characterization of this railroad as a governmental instrumentality was based upon its finding that it was designed and used primarily, not for commerce, but as an auxiliary to aid in the management and operation of the Panama Canal, a governmental enterprise; and by reason of its purpose and use, partook of the nature of the Canal itself, to which it was a necessary adjunct. The Court stated: "We attach no importance to the fact that the railroad company has utilized both its ships and railroad to carry private freight and passengers. The record shows that this is done to a limited extent compared with the government business; and that it is only incidental to the governmental operations. The primary purpose of the enterprise being legitimately governmental, its incidental use for private purposes affords no ground for objection. * * *"

Unlike the Panama Canal Railroad, the Belt Line is not used for the purpose of transporting government personnel, or government freight. In no material respect does it function differently from any privately owned common carrier railroad. Its main purpose, to be true, is to facilitate the commerce of the Port of San Francisco, rather, than as in the case of a privately owned carrier, to earn a profit for its owner. But this is a purpose which could likewise be accomplished in the hands of private carriers. In fact, a portion of the Belt Line is, at the present time, being operated by private carriers as agents of the State. Whether government ownership has greater public advantages than private ownership in any particular enterprise is not a proper subject of judicial inquiry where the nature of the enterprise, governmental or proprietary, is the issue. In Helvering v. Powers, 293 U.S. 214, 55 S.Ct. 171, 173, 79 L.Ed. 291, the United States Supreme Court held that the operation by the State of Massachusetts of a street railway system was not a normal governmental function so as to withdraw such operation from the federal taxing power. And, further, that: "The fact that the state has power to undertake such enterprises, and that they are undertaken for what the state conceives to be the public benefit, does not establish immunity. * * * The necessary protection of the independence of the state government is not deemed to go so far."

Plaintiff endeavors to distinguish the Belt Line from the usual common carrier of goods by rail for hire, in that the Belt Line is operated by the State as an integral part of the State owned and operated Port of San Francisco. The argument is that the operation of the harbor itself is governmental in nature; and that the Belt Line, connecting therewith, not as a profit making enterprise, but to facilitate the commerce of the Port, thereby partakes of the governmental nature of the Port itself. Unless it cannot, consistently with interests of vital public welfare, be carried on privately, there seems to be no valid reason why a business normally private in nature and otherwise subject to federal taxation, should be clothed with governmental immunity from such taxation when taken over by the state, solely because it is being operated in connection with the performance of an essentially governmental function. And plaintiff has not shown wherein interests of vital public welfare require government, in place of private ownership and operation of the Belt Railroad.

In the construction and maintenance of streets, roads and highways, government is performing an essentially and traditionally governmental function—that of facilitating safe and convenient transportation. Yet if the state should, for the purpose of further facilitating transportation along government owned roads and highways, provide a street railway, or bus, or transfer line, there is no reasonable basis apparent to this court, for holding immune from federal taxation any such railway, bus or transfer line because it is being operated over government owned roads and highways.

In Helvering v. Powers, supra, it appeared that while the state took over the operation of the street railway, the property of the railway system remained in private ownership. The Court did state, however, that: "If, in the instant case, the commonwealth had acquired the property of the company and had organized management of it in perpetuity by the state government, instead of temporarily, or had

taken over all the street railways in all its cities for direct operation by the commonwealth, there would appear to be no ground, under the principles established by the decisions we have cited, for holding that this would effect the withdrawal of the enterprise from the federal taxing power."

The Belt Line is not alone a medium to facilitate the flow of commerce through the Port. It is an active participant in the commerce of the Port in its transportation of the articles of commerce moving through the Port. In this respect, it transcends the functions performed by mediums of commerce such as roads, bridges or canals which are admittedly, when established by government, government instrumentalities. Its aim, to be sure, is not one of profitmaking. But its aim does not determine its status. In Brush v. Commissioner of Internal Revenue, 300 U.S. 352, 57 S.Ct. 495, 81 L.Ed. 691, 108 A.L.R. 1428, the Court stated that if service be governmental in nature, it does not become private because a charge is made for it, or a profit realized. Conversely, if service be non-governmental in nature, it does not become governmental because no profit is anticipated. In State of South Carolina, supra, the court held that since the business of selling intoxicating liquor is not governmental in character, it does not become so because the state took charge of such business in the exercise of its police power. And, in Allen v. Regents of University System of Georgia, 304 U.S. 439, 58 S.Ct. 980, 82 L.Ed. 1448, the United States Supreme Court held that since the conduct of athletic exhibitions for admissions paid by the public is not governmental in character, it does not become so because the state engages in such activity in order to provide the means with which to carry out a program of public education.

It is true that there is a public necessity for the maintenance of a means of transporting cargo between the wharves and piers of the Port of San Francisco and carriers and industries located within the confines of the City of San Francisco. But the mere fact of such public necessity furnishes no basis for classifying such activity as a governmental function; for public necessity logically will always precede the establishment of such facilities, whether by government or private industry. It is not public necessity for a particular service which necessarily renders that service governmental in nature. It is, rather, necessity for public ownership and operation of the service, by reason of its nature, which makes it essentially a governmental function. And there is nothing in the nature of a transportation system for the carriage of freight for the public for hire to and from a government owned port which makes its ownership and operation by government, of vital public necessity.

■ It is the conclusion of this Court that the operation by the State of California of the Belt Line is not an essentially and traditionally governmental function; that, in its operation of such line, the State is not immune from the payment of the federal excise tax imposed on it, nor are the employees of the Belt immune from the payment of the federal income tax imposed on them, by virtue of the provisions of the Carrier's Taxing Act of 1937.

It is therefore ordered that Defendant be and he is hereby entitled to judgment in his favor. And that findings of fact and conclusions of law and judgment be prepared and submitted in accordance with this opinion.